<u>AFFIDAVIT IN SUPPORT OF APPLICATIONS</u>

I, Nicholas Ponte, being duly sworn, depose and state that:

INTRODUCTION

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been so employed since April 2023. I am currently assigned to the New England Field Division, Task Force 1, where I am tasked to investigate drug trafficking and money laundering organizations and their ties to violent crime. In April 2023, I graduated from the DEA Basic Agent Training Academy in Quantico, where I received specialized training in narcotics and money laundering investigations and related legal matters. Prior to my employment as a Special Agent, I served in the United State Marine Corps as a Scout Sniper Team Leader and Marksmanship Instructor, and I currently serve in the Marine Corps Reserve based in Devens, Massachusetts. Upon completion of Active Duty service, I enrolled in an internship with the Massachusetts State Police Explosive and Arson Detection Unit. I assisted in the handling of State Police K-9s trained to detect potential accelerants on crime scenes along with the detection of explosives and firearms. Before that, I completed an undergraduate degree in Criminal Justice with a minor in Political Science from Merrimack College in North Andover, Massachusetts, where I focused on policy related to national security, public safety, and transnational criminal investigative models.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.

3.     I have received significant training in the field of narcotic investigations and enforcement.  Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

4.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.  This includes the use or threatened use of firearms.  As a result, I am familiar with the fact that drug traffickers often use and/or possess firearms in furtherance of their drug trafficking crimes.

5.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and in furtherance of their drug trafficking activities. As a result of my training and experience, I am familiar with how drug traffickers use telephones, and use coded, veiled, or slang-filled conversations or electronic text messages to facilitate their illegal activities. I am also familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise their conversations and operations.

6.     Based on my training and experience, I am also familiar with the methods and activities of drug traffickers operating at the local, state, national, and international levels, including how drug traffickers distribute, store, and transport drugs and drug proceeds. I am also familiar with the how drug traffickers often store drugs and drug proceeds at residence and at locations commonly referred to as "stash houses."

PURPOSES OF AFFIDAVIT

7.     I submit this affidavit in support of a criminal complaint charging Whilo RECIO ("RECIO") with distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. 841(a)(1) (the "Charged Offense").

8.     I further submit this affidavit in support of applications for search warrants under Federal Rule of Criminal Procedure 41 for the following:

a.     20 Almont Street, Boston, Massachusetts, Apartment 1 and Basement, as described in greater detail below and in Attachment A-1 (the "Target Location")

b.     The person of Whilo RECIO, any cellular telephones in his custody or control, and any bags or items in his custody or control, as described in greater detail in Attachment A-2.

9.     Based on the facts set forth in this affidavit, there is probable cause to believe that RECIO has committed the Charged Offense, and further that RECIO possesses and has possessed firearms in furtherance of his drug trafficking activities, in violation of 21 U.S.C. § 924(c)(1)(A) (together with the Charged Offense, the "Target Offenses").

10.     There is also probable cause to believe that:

a.     The Target Location contains evidence, fruits, and instrumentalities of the

Target Offenses, as described in Attachment B-1; and

b. The person of RECIO, any cellular telephones in his custody or control, and any bags or items in his custody or control, contain evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B-2; and

11.    As part of my duties, I am currently participating in an investigation into the criminal activity of RECIO.  I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the DEA and other federal, state, and local law enforcement agencies.  I have also reviewed information from a variety of additional sources, including telephone records, responses to administrative subpoenas, controlled purchases of narcotics, review of RECIO's social media accounts, and the results of a search warrant on RECIO's van.

12.    This Affidavit is submitted for the limited purpose of establishing probable cause to support the criminal complaint and for the requested warrants.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in the investigation.  I have set forth only the facts that I believe are needed to establish the requisite probable cause.

## PROBABLE CAUSE

13.    Investigators have been conducting an ongoing narcotics investigation into RECIO since at least September 2023.

### *The Charged Offense*

14.    DEA investigators have utilized a confidential source ("CS")[1] to conduct controlled

---

1 CS has been cooperating with investigators since approximately May 2023, in hopes of receiving leniency in sentencing for state narcotics charges.  CS has a criminal history that also includes arrests for assault and battery with

purchases of narcotics from RECIO. For example, on January 11, 2024 and February 22, 2024, at the direction and under the supervision of investigators, CS contacted RECIO to purchase 100 grams of fentanyl on each occasion. For the January 11 controlled purchase, CS communicated with RECIO via Snapchat to coordinate the transaction, which then took place in Old Orchard, Maine. For the February 22 controlled purchase, CS communicated with RECIO via Snapchat and WhatsApp to coordinate the transaction. During the conversation leading up to this February transaction, RECIO asked CS to do him a favor and bring back a half-kilogram of fentanyl from the stash house in Old Orchard, Maine to RECIO's residence at the Target Location. CS declined this request due to the risk of traveling with a significant quantity of fentanyl. RECIO then told CS that although he could pick up the 100 grams of fentanyl CS had requested in Old Orchard, Maine, CS should bring the payment ($1,500) to RECIO at the Target Location. RECIO explained that one of his coconspirators in Maine would deliver the drugs to CS because RECIO was then on probation from a Massachusetts state court matter and had been ordered to wear a GPS ankle monitor which prevented him from leaving his residence at the Target Location. Following these communications, CS traveled to Old Orchard, Maine, where CS met with a female who provided CS with 100 grams of fentanyl. The CS attempted to give the female the $1,500 but she refused the money. CS then traveled (while still under surveillance by investigators) to the Target Location. CS contacted RECIO via WhatsApp when CS arrived outside the Target Location. RECIO then walked out from the rear of the Target Location building and met with CS in the driveway outside the Target Location, where CS delivered the $1,500 payment for the 100 grams of fentanyl. Investigators then observed RECIO re-enter the

a dangerous weapon as well as drug offenses. During the course of CS's cooperation, the information provided by CS has been corroborated to the extent possible and CS is believed to be reliable. During the course of CS's cooperation, CS was also arrested for assault by means of a dangerous weapon in early 2025, the charges were dismissed, however.

Target Location building.

15.    **Charged Offense**: On March 5, 2024, at the direction and under the supervision of investigators, CS contacted RECIO via Snapchat voice. RECIO told CS to give him 10-15 minutes to prepare the 28 ounces of cocaine that CS was interested in purchasing. RECIO asked whether CS preferred cocaine or crack cocaine, and CS confirmed powder. RECIO directed the CS to meet at RECIO's residence—which CS understood to mean the Target Location because CS had previously visited RECIO at the Target Location.

16.    Investigators searched CS and CS's vehicle for contraband with negative results and equipped CS with an audio recording device. Investigators followed CS to 20 Almont Street. CS notified RECIO via Snapchat that CS had arrived at the residence. Shortly thereafter, RECIO exited the Target Location building and entered the CS vehicle. Inside, the CS exchanged $800 in official funds for 28 grams of suspected powder cocaine inside a clear plastic bag. RECIO notified CS that RECIO was expecting a 6-kilogram delivery (3 kilograms of cocaine and 3 kilograms of fentanyl) to the Target Location in the coming days. RECIO noted that his supplier was charging high prices and asked CS if CS was aware of anyone who could supply RECIO with that amount of drugs. CS stated that CS would ask around. Shortly thereafter, RECIO exited CS's vehicle and went back to the Target Location building. CS met with investigators and relinquished the bag of suspected cocaine powder. Investigators conducted a field test of the substance which tested positive for cocaine. The DEA laboratory also confirmed that the substance contained cocaine (with 91% purity) and weighed 28.9 grams.

17.    Based on the above, I believe RECIO delivered approximately 28.9 grams of cocaine to CS on March 5, 2024 and therefore has committed the Charged Offense.

18.    Based on these controlled purchases of fentanyl, I further believe RECIO uses a

smartphone with social media/communications applications (such as WhatsApp and Snapchat) in furtherance of his drug trafficking. I also believe that RECIO has resided at the Target Location for at least a year, that he used his smartphone while at the Target Location to conduct his illegal activities, and that he stored drugs, as well as cash proceeds of his drug trafficking, within the Target Location.

### Target Location

19. 20 Almont Street, Boston, Massachusetts is a three-story (plus basement), multi-unit building with yellow siding and white trim. The building has a gray concrete set of stairs leading to the front of the building, a driveway to the left, and a pathway leading to the back of the building to the right. There is a three-slot mailbox to the left of the front door. The Target Location is Apartment #1 on the first floor of 20 Almont Street, as well as the basement. The Target Location can be accessed via a side door on the left side of the building, which opens to a staircase that leads to the basement as well as to the second floor, and then an interior door to Apartment #1 which is on the same level as the exterior door.

20. As detailed above and herein, there is probable cause to believe that the Target Location is RECIO's primary residence, that RECIO has control and use of both Apartment 1 and the basement of 20 Almont Street, and that evidence, fruits, and instrumentalities of the Target Offenses will be located within the Target Location.

21. RECIO's Massachusetts Driver's license lists his residential address as "20 Almont Street, #1, Mattapan, Massachusetts." I know that Mattapan is a section of Boston and believe this is the same address as the Target Location.

22. CS has visited RECIO inside the Target Location and described that when one enters the door on the left side of the building, there are staircases leading to the basement as well

as to the second floor, but that the interior door to Apartment #1 on the same floor as the exterior door and is right inside that exterior door. CS further stated that CS had previously observed both narcotics and firearms inside the Target Location.

23. As detailed below, investigators placed a GPS on a vehicle utilized by RECIO, and this location information indicated that the vehicle was parked outside the Target Location for an extended period of time as recently as May 12, 2025. As such, I believe RECIO still resides at the Target Location.

24. Investigators have reviewed RECIO's public social media accounts and have observed Snapchat videos of RECIO holding firearms. For example, a video from June 2024 depicts RECIO at the firing range with a AR-style rifle. Additionally, in a video from January 2024, RECIO is captured holding a different rifle inside a building. CS reviewed this video with investigators and recognized RECIO's location in the video as the basement of 20 Almont Street (within the Target Location), based on CS's prior visit(s) to the Target Location. Based on the above, I believe RECIO has control over both Apartment 1 and the basement at 20 Almont Street and that he uses both in furtherance of the Target Offenses.

25. In April 2025, investigators spoke with a non-testifying confidential informant (CI) who had a close personal relationship with RECIO. CI asked to speak to investigators after CI was arrested in possession of narcotics and provided information in hopes of receiving leniency with respect to charges and/or sentencing. CI was a drug user who identified RECIO as his/her supplier. CI explained that RECIO had provided CI with narcotics "more times" than CI could count. CI provided RECIO's home address as 20 Almont Street, Boston, Massachusetts, and stated that CI had been to RECIO's residence there.

*Further Evidence of the Target Offenses*

26.     In addition to the information noted above, CI also provided information about RECIO's narcotics trafficking.  CI explained that RECIO made trips from Massachusetts to Maine approximately every 2 weeks and that RECIO would deliver to customers including a customer, A.C,[2] who lives in Maine.  CI explained that RECIO often used rented vehicles to travel up to Maine on a Thursday or Friday and then drive back to Boston on Saturday or Sunday.

27.     In May 2025, RECIO contacted CS and asked to borrow CS's personal vehicle for purposes of transporting narcotics.  RECIO also mentioned wanting to "bring down a 9mm," which CS understood to mean that RECIO wanted to bring CS a 9mm firearm in exchange for allowing RECIO to use CS's vehicle for his narcotics activities.

28.     CS notified investigators of this request and, with CS's consent, investigators installed a GPS tracking device on CS's vehicle prior to CS delivering the vehicle to RECIO.

29.     On May 2, 2025, CS notified investigators that, based on RECIO's Snapchat posts, it appeared RECIO was driving north.  Investigators reviewed GPS data for CS's vehicle, being operated by RECIO, and confirmed that the vehicle was driving on I-93 North.  By approximately 11:44 p.m., the vehicle was stopped on Old Washburn Road, Caribou, Maine.[3]

30.     On May 6, 2025, Maine investigators were notified of two fatal overdoses at A.C.'s residence on Old Washburn Road, Caribou, Maine.  One of the victims was A.C.  The address of these overdoses is the same address at which RECIO had stopped CS's vehicle in the late evening of May 2, 205.  Inside A.C.'s residence, investigators located approximately 200 grams of suspected fentanyl, 300 grams of suspected methamphetamine, large amounts of drug distribution

---

2 I am aware of A.C.'s full name and identity.  Because, as explained below, AC is now deceased from a suspected drug overdose, I am withholding A.C.'s full name for victim privacy.
3 I am aware of the specific address at which the vehicle was parked but am withholding that specific address again for the sake of the victim's privacy.

paraphernalia, and approximately $15,000 in suspected drug proceeds. Results of the autopsy are outstanding but A.C. and the other victim are believed to have overdosed on narcotics.

31.     Based on the information provided by CI that RECIO supplied A.C. with narcotics in Maine, and the fact that RECIO had driven CS's vehicle to A.C.'s residence on May 2, 2025— just 4 days before the overdoses—I believe RECIO supplied A.C. with the narcotics found inside A.C.'s residence and that those narcotics may have been the cause of the overdoses.

32.     On the evening of May 12, 2025, CS notified investigators that RECIO had driven CS's vehicle back to CS and that the two talked in person. CS reported that RECIO again offered to provide a 9mm firearm to CS as "payment" for allowing RECIO to use CS's vehicle. CS declined and asked to discuss further the following day (May 13, 2025). RECIO also asked CS to help RECIO transport approximately 15 firearms that RECIO had stored inside a Honda Odyssey van (the "Odyssey") parked in the vicinity of 700 Washington Street, in Dorchester, Massachusetts. RECIO told CS that he stored the guns in a "hide" in a speaker in the roof of the van, as well in the floorboard of the van. RECIO explained that the guns included 5 Uzi firearms, and that two of those Uzis had suppressors. RECIO explained that he wanted CS's help to move and/or sell all but one of the firearms, because RECIO wanted to retain one of the Uzis to use to shoot someone.

33.     After meeting with RECIO, CS traveled to the area of 700 Washington Street, in Dorchester and observed the Odyssey parked in the lot behind 751 Washington Street. CS notified investigators of this observation.

34.     On May 13, 2025, investigators commenced physical surveillance in the area of 751 Washington Street, Dorchester. There, they observed the Odyssey, matching the description provided by RECIO. Investigators walked near the vehicle and observed from the outside that

there were areas consistent with the "hides" RECIO had described in the speaker and floorboard.

35. In the afternoon of May 13, 2025, at the direction of investigators, CS recorded a conversation with RECIO about the firearms and the Odyssey. Investigators who speak Spanish have reviewed the recording and have determined that, in sum and substance, CS offered to RECIO to go today (May 13) to move the firearms, but noted that CS did not want to go to just move one or two of the firearms. RECIO confirmed that they were "all there," which CS and investigators understood to mean that all of the multiple firearms possessed by RECIO were currently stored inside the Odyssey.

36. In the early evening of May 13, 2025, the Court authorized a search warrant for the Odyssey (25-5167-JGD). Later that evening, investigators executed the search warrant on the Odyssey and located multiple firearms and ammunition inside, including a suppressed MAC-10, an AR-15, and a loaded shotgun, as well as various ammunition and an additional suppressor, as depicted below.



37. Based on all of the above, I believe RECIO has multiple firearms stored inside the Odyssey and that he possessed those firearms in furtherance of his drug trafficking operation.

38.     The firearms found in the Odyssey did not total 15 firearms, and did not include 5 Uzis, or the 9mm that RECIO had promised to give to CS.  As a result, I believe RECIO may have these additional firearms stored elsewhere, including at the Target Location and/or on his person at the time of his arrest.

### Drug Traffickers' Use of Residences and Cellular Telephones

39.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.  As detailed above RECIO came from the Target Location building before distributing narcotics to the CS on March 5, 2024, which I believe indicates that RECIO, like other drug traffickers, utilizes his residence in furtherance of the Target Offenses.

40.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively,

will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

41.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts.

42.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

43.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones

are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

44.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

45.     Drug traffickers maintain weapons, including firearms and ammunition, to protect their drugs and/or drug proceeds and to threaten to harm or actually harm those who interfere with drug traffickers' business.   I know that drug traffickers often maintain these weapons in their residence and/or on their persons to protect themselves as well as their money and drugs.

46.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience,

and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1 and B-2 on their cellular telephones.

47.    It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

48.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

49.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded

to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

50.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

        a.   controlled substances;

        b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders,

glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c. books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d. personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e. cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f. documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts,

passports and visas, credit card receipts, and telephone bills and related communications;

g. cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h. firearms and other dangerous weapons; and

i. identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

51.     I request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court, except that the government may produce them in criminal discovery.  These documents discuss an ongoing

criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

CONCLUSION

52.     Based on the foregoing, I believe there is probable cause to believe:

    a.  RECIO distributed and possessed with intent to distribute controlled substances on March 5, 2024, in violation of 21 U.S.C. § 841 (the Charged Offense);

    b.  RECIO also possesses and possessed firearms in furtherance of his drug trafficking business, in violation of 18 U.S.C. §924(c)(1)(A);

    c.  the Target Location contains evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B-1;

    d.  The person of RECIO, any cellular telephones in his custody or control, and any bags or items in his custody or control, contain evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B-2; and

As such, I request that the Court issue the requested criminal complaint and search warrants.

Nicholas Ponte
Special Agent, DEA

Sworn by telephone in accordance with Fed. R. Crim. Pr. 4.1 this 14th day of May, 2025

HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

(Location to be Searched)

20 Almont Street, Boston, Massachusetts is a three-story (plus basement), multi-unit building with yellow siding and white trim, as depicted below. The building has a gray concrete set of stairs leading to the front of the building, a driveway to the left, and a pathway leading to the back of the building to the right. There is a three-slot mailbox to the left of the front door. The Target Location is Apartment #1 on the first floor of 20 Almont Street, as well as the basement. The Target Location can be accessed via a side door on the left side of the building, which opens to a staircase that leads to the basement as well as to the second floor, and then an interior door to Apartment #1 which is on the same level as the exterior door.



**ATTACHMENT B-1**

(Items to be Seized)

All records from March 2024, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Section 841 (distribution and possession with intent to distribute controlled substances), and Title 18, United States Code, Section 924(c)(1)(A) (possession of firearms in furtherance of drug trafficking) (the "Target Offenses") including:

1.      Firearms and ammunition.

2.      Books, records, receipts, notes, ledgers, and other papers relating to the distribution of narcotics and/or the possession of firearms, personal telephone/address books, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

3.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

4.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.      Photographs, videos, or other records concerning the Target Offenses, or the identities of coconspirators.

7.      Cellular telephones believed to be used by RECIO, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or referencing individuals engaged in money laundering, located in the memory of any mobile telephone, including but not limited to:

        a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.   Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.   Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing the Target Offenses and/or referencing individuals engaged in the Target Offenses.

d.   Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing the Target Offenses;

e.   GPS data;

f.   Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing the Target Offenses or individuals engaged in the Target Offenses;

g.   Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing the Target Offenses;

h.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.   Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**Search and Seizure of Electronically Stored Information ("ESI")**

The items to be seized from the Target Location includes any cellphones, computer devices, and storage media which are reasonably believed to be owned or used by Whilo RECIO and that may contain any electronically stored information falling within the categories set forth in this Attachment above, including, but not limited to, cellphones, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the Target Location are:

1.   Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.      Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.      Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## Review of Electronically Stored Information ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

•       surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

•       opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

•       scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

•       performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

•       reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

During the execution of the search of the Target Location described in Attachment A-1, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using biometric features, this warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of RECIO to the fingerprint scanner

of the devices found at the Target Location; (2) hold the devices found at the Target Location in front of the face of RECIO and activate the facial recognition feature; and/or (3) hold the devices found at the Target Location in front of the face of RECIO and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The warrant does not authorize law enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. This warrant does not authorize the use of unreasonable physical force to secure compliance with its authorizations.

Law enforcement personnel are authorized to change device settings on any seized device(s) to disable "Stolen Device Protection."

### Return of Seized Computer Equipment

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

Law enforcement personnel is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant until the completion of its investigation or the completion of any trial, appeal, or collateral proceeding involving the records and data seized, after which time law enforcement personnel will dispose of the account duplicate consistent with the agency's evidence disposal policy.

**ATTACHMENT A-2**

(Person and Property to be Searched)

The person and property to be searched are:

**Whilo RECIO**, DOB 3/11/97, any cellular telephones in his custody or control, and any bags or items in his custody or control.  RECIO is depicted below.



**ATTACHMENT B-2**

(Items to be Seized)

All records from March 2024, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Section 841 (distribution and possession with intent to distribute controlled substances), and Title 18, United States Code, Section 924(c)(1)(A) (possession of firearms in furtherance of drug trafficking) (the "Target Offenses") including:

1. Firearms and Ammunition

2. Cellular telephones believed to be used by RECIO, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or referencing individuals engaged in money laundering, located in the memory of any mobile telephone, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing the Target Offenses and/or referencing individuals engaged in the Target Offenses.

   d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing the Target Offenses;

   e. GPS data;

   f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing the Target Offenses or individuals engaged in the Target Offenses;

   g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing the Target Offenses;

   h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**Search and Seizure of Electronically Stored Information ("ESI")**

The items to be seized from the person of While RECIO includes any cellphones, computer devices, and storage media which are reasonably believed to be owned or used by RECIO and that may contain any electronically stored information falling within the categories set forth in this Attachment above, including, but not limited to, cellphones, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from RECIO are:

1. Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

**Review of Electronically Stored Information ESI**

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

• surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

• opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

•       scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

•       performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

•       reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

During the execution of the search of RECIO described in Attachment A-2, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using biometric features, this warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of RECIO to the fingerprint scanner of the devices found at the Target Location; (2) hold the devices found in front of the face of RECIO and activate the facial recognition feature; and/or (3) hold the devices found in front of the face of RECIO and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.  The warrant does not authorize law enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices.  Moreover, the warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.  This warrant does not authorize the use of unreasonable physical force to secure compliance with its authorizations.

Law enforcement personnel are authorized to change device settings on any seized device(s) to disable "Stolen Device Protection."

**Return of Seized Computer Equipment**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files

that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

Law enforcement personnel is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant until the completion of its investigation or the completion of any trial, appeal, or collateral proceeding involving the records and data seized, after which time law enforcement personnel will dispose of the account duplicate consistent with the agency's evidence disposal policy.